UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:21-cr-00360 (DLF) |
| v. : | |
| : | |
| BRITTIANY ANGELINA DILLON, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Dillon to three months of home confinement, a probationary term of three years, 60 hours of community service, and $500 in restitution.

**I.   Introduction**

The defendant, Brittiany Dillon, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage. The defendant stands before this Court to be sentenced on a misdemeanor conviction, but her conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed.

The government recognizes that Brittiany Dillon did not personally engage in or espouse violence or property destruction on January 6, and that she accepted responsibility early. On the

1

other hand, her presence at the Capitol, and her efforts to get inside, were clearly motivated by false information, as indicated by text messages she sent to another rioter. In these text messages, Dillon indicated that the new administration stole the election and planned to hand the country over to a foreign adversary. She anticipated that a civil war was coming, and her side—which wore the white hat—would win, decisively. And, as she later wrote to another rioter, she "fought hard" to get inside the Capitol on January 6. A period of home confinement, and a three-year term of probation, is appropriate here because Dillon's thinking demonstrates a willingness to countenance political violence and a risk of engaging in such violence going forward.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol set forth in the Statement of Offense. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Brittiany Dillon's Role in the January 6, 2021 Attack on the Capitol*

Before the attack on the Capitol took place, Dillon exchanged text messages with another rioter in which they discussed false information about the 2020 Presidential election—which would, eventually, support Dillon's decision to commit offenses on January 6, 2021. On December 14, 2021, the other rioter texted Dillon to ask, "what you know so far," and Dillon explained:

> So..republican electors have been sent to a few of the states in question [presumably, Arizona, Georgia, Pennsylvania, and Wisconsin]. MI has had some voter fraud arrests. Declass may be imminent. With all the info on CCP [Chinese Communist Party] Members being outed and having infiltrated every govt and corp they won't be able to do much. Worse case scenario there will be a legit military coup..not against 45 [former President Trump] but against the deep state.

Dillon also added that "Ratcliffe [presumably John Ratcliffe, the Director of National Intelligence at the time] is working behind the scenes too." Dillon advised this other rioter to "make sure you and your mom have supplies," claiming that "the initial quarantine [presumably, Maryland's response to the COVID-19 pandemic] was a test run to get us all stocked up." She further claimed that "We may lose all communications. An all out civil war may start. It will be fast because our side is more prepared." When the other rioter asked who would fight that war, Dillon anticipated "potentially other military..maybe even foreign soldiers." She claimed to have heard a story from her father about Chinese soldiers who had infiltrated Canada and Maine, and who were bombed by the U.S. government. According to Dillon, the news media did not cover these supposed events because they "lie outright and by omission" and "keep everyone hypnotized." She further claimed that if Hillary Clinton had won the presidency in 2016, she and Democrats planned to "Shut the country down then let the UN or Chinese take over."

In that same chain of text messages, Dillon anticipated that their might soon be a brief period of anarchy, and that the American political situation was "Just like when you exorcise a demon..just before they are banished they fight the hardest." The other rioter asked Dillon if she thought "they" could overturn the election, to which Dillon replied, "they I guess already did, but it's about to be fully in our favor." The other rioter claimed to be angriest that "they" have abundant evidence of voter fraud, but "they" lie about the absence of fraud. Dillon replied, "They will never stop..their lifestyle is lies." All of this information reveals what Dillon hoped to accomplish when she traveled to the Capitol and participated in the riot.

On January 6, 2021, Dillon left her home in Maryland early in the morning to drive to Washington, D.C. As she explained to this other rioter in text messages, she had to plan a route through Arlington because of street closures, then park in Washington west of the closed streets.

3

Dillon planned to attend the former President's rally at the White House's Ellipse, then march to the Capitol. At approximately 2:18 p.m., Dillon attempted to enter the Capitol through the Senate Carriage Doors. These doors are on the northeast side of the building; they face due east, towards First Street N.E. and the Supreme Court of the United States. The doors enter onto the building's second level and are at the same elevation as the eastern doors leading to the Capitol rotunda.

By the time Dillon reached the Capitol building, a crowd had gathered on the steps leading to the Senate Carriage Doors. She worked her way through the crowd and reached the landing before the doors. There, over a period of about 40 seconds, Dillon struggled to get up to the door and—apparently—across the threshold. She fell as she approached the threshold, then immediately stood back up. As this happened, law enforcement officers were trying to secure the door. On video, Dillon appeared to try to talk with these officers. Then, the officers moved their line to allow a small group of rioters, who had already breached the Capitol, to leave the building. Dillon struggled to stay where she was but was pushed back and to the side by the moving police officers and the crowd of rioters. Shortly after this happened, the police successfully closed the Senate Carriage Doors.

Dillon walked away after this and did not make another attempt to enter the Capitol building. She later reported to the other rioter that "I was there. I got pepper sprayed at the door of the capital and tear gassed 3 times making my way up to it" and "I fought hard…I fell in the door and they tried to beat me with batons so I backed off and they pepper sprayed my eyes." When the other rioter wrote "Sorry but I used to back the blue but fuck them" and "They got their ass beat by Patriots," Dillon replied "Never again!!! They are devils." Dillon then told this other rioter that she was "semi-blind..don't mind the weird face lol" and sent a photograph of the top half of her face. The two discussed how each of them got home. The other rioter said he took the metro. Dillon

wrote that she was "anxious and pissed off walking back. I parked by the fish market and my vision was messed up and it took me a bit." Dillon then wrote about how she made it back to her house "after getting lost like 4 times walking and driving."

The next day, the other rioter asked Dillon why she deleted her Instagram account. Dillon told the other rioter that she had been reported, said that her bank account had been hacked, and her family was all on Instagram so it would be easy to find them if someone wanted to harm them. Dillon further explained:

> honestly at this point I am so done trying to wake people up. They all just want to be in an echo chamber..even the ones who claim to be the best truthers in the world. I want to be with my tribe..other lions..not sheep who can't see that we're all part of one giant psyop and this has been planned for years. Tired of settling for politicians who compromise their beliefs in the name of kissing ass and optics.

In an interview following her change of plea, Dillon said that she did not expect the violence at the Capitol on January 6. She claimed, at different times, that she thought someone was going to kill former President Trump, or would kill members of the crowd, like her. When asked why she did not leave, she said that she stayed because there were veterans present, and that now was the time to protest, or else the United States would end up without free speech, like China. She acknowledged talking with the other rioter but claimed she tried to keep their communications silly and lighthearted, and not discuss the Presidential election. At least during the period spanning December 14, 2020 through January 6, 2021, this was untrue: they almost exclusively talked about the election. Dillon also claimed that she did not support violence except in extreme circumstances like the Revolutionary War, but it is clear from her text messages that she viewed the Presidential succession as such an extreme circumstance. Dillon also said that she is tired of being a pawn in a political movement, and that she has disconnected herself from social media.

*The Charges and Plea Agreement*

On April 26, 2021, Dillon was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D). On May 11, 2021, Dillon surrendered herself to the FBI in Washington, D.C. On May 14, 2021, Dillon was charged by Information with the same crimes; a superseding information was filed on July 12, 2021, modifying the language of Count Three. On July 15, 2021, Dillon pleaded guilty to Count Three of the Superseding Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(D). In her plea agreement, Dillon agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(D). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.[1]

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities

---

[1] The plea agreement also states that this count carried a maximum of one year of supervised release, pursuant to 18 U.S.C. § 3583(b)(3). This was incorrect. Section 3583(b)(3) authorizes a year of supervised release "for a misdemeanor (other than a petty offense)." The offense charged in Count Three is a petty offense. 18 U.S.C. §§ 19, 3559; 40 U.S.C. §§ 5104(e)(2)(D), 5109.

among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). We therefore turn to these factors.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. So, too, does the conviction this defendant now faces. Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6 is not like picketing at the Capitol some other day, without other rioters present.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant

traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Here, Dillon clearly associated herself with an effort that she anticipated would be violent. She described her opponents as treasonous, writing of a secret plan to surrender the United States to a foreign adversary. She compared efforts to block the inauguration of a legitimately-elected President with an exorcism, and wrote of a coup and a civil war. After the riot, she compared law enforcement officers to devils. It was clear that Dillon's approach to the Capitol building was based on a desire to halt the certification of the Electoral College vote. But beyond this, Dillon demonized those officers sworn to protect *any* members of Congress—regardless of party. These views are toxic, are of the sort used to support political violence, and demonstrate a potential for recidivism.

The nature and circumstances of the riot generally support a sentence of incarceration. While Dillon was pushed back and did not end up making it beyond the building's threshold, her violent statements before January 6 and her after-the-riot statement that she "fought hard" merit more than a probationary sentence.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Dillon has no criminal history. If the Sentencing Guidelines did apply to her offense of conviction, she would have zero points. USSG § 4A1.2(c)(2). Accordingly, she would be in Criminal History Category I. USSG §§ 4A1.1, 5A. Dillon has held different hourly employment positions in the past but now appears to be between jobs.

The government also notes that from the outset, through her attorney, Dillon expressed a desire to plead guilty and promptly resolve her case. When recommending an appropriate sentence, the government gives significant weight to the defendant's early resolution of this case.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, 8/4/2021 Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

9

6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demand deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider. And here, especially, the violence of Dillon's pre-riot rhetoric strongly suggests that a term of home confinement and a long probationary period are needed to promote the goal of specific deterrence. Dillon anticipated a civil war, the invasion of the United States by a foreign power, and that one of the United States' two major political parties was not just the opposition, but an adversary in league with that power. It is commendable—if it is true—that Dillon now wishes to disconnect herself from politics and has removed herself from the social media environment that fed these views. But it is impossible to separate that claim from the fact that Dillon has been arrested and prosecuted for her conduct. Simply put, her word is not enough

to ensure the Court that she will not repeat such criminal action. Home confinement, followed by a lengthy term of supervision, is the best way to ensure that Dillon does not repeat her conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default. Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097(PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of active incarceration. While those who trespassed, but engaged in fewer aggravating factors, deserve a

11

sentence more in line with minor incarceration or home confinement. After a review of the applicable § 3553 factors, the government believes that the defendant's conduct falls in the latter category. Nevertheless, motivated by lies, Dillon associated herself with an effort that she saw as part of a civil war, and thus, should not be compared to those who obtained just a probationary sentence.

## V.   Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, the nature and circumstances of the offense, need to promote respect for the law, and need to promote deterrence counsel for a less lenient sentence than have been imposed upon some other defendants who are charged with misdemeanor offenses arising out of the Capitol Attack. On the other hand, Dillon's lack of criminal history and early acceptance of responsibility support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Dillon to three months of home confinement, three years of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Dillon's liberty while also recognizing her early acceptance of responsibility.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By:   */s/ Michael J. Romano*
MICHAEL J. ROMANO
Trial Attorney, Detailee
IL Bar No. 6293658
555 4th Street, N.W.
Washington, D.C. 20530
202-307-6691
michael.romano@usdoj.gov