```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                           FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,        .
                                       .   Case Number 21-360
 4              Plaintiff,             .
                                       .
 5         vs.                         .
                                       .
 6    BRITTIANY ANGELINA DILLON,       .   November 4, 2021
                                       .   9:06 a.m.
 7              Defendant.             .
      - - - - - - - - - - - - - - - - -

 8

 9                       TRANSCRIPT OF SENTENCING HEARING
                     BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                        UNITED STATES DISTRICT JUDGE

11

12    APPEARANCES:

13    For the United States:      MICHAEL ROMANO, AUSA
                                  United States Attorney's Office
14                                555 Fourth Street Northwest
                                  Washington, D.C. 20530
15

16    For the Defendant:         THOMAS ABBENANTE, ESQ.
                                  888 17th Street Northwest
17                                Suite 1200
                                  Washington, D.C. 20006
18

19

20    Official Court Reporter:    SARA A. WICK, RPR, CRR
                                  United States District Court
21                                   for the District of Columbia
                                  333 Constitution Avenue Northwest
22                                Room 4704-B
                                  Washington, D.C. 20001
23                                202-354-3284

24

      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S

 2         (All participants present via video conference.)

 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4     Action 21-360, the United States of America versus Brittiany

 5     Dillon.

 6         If I can have the parties identify themselves for the

 7     record, beginning with the United States.

 8              MR. ROMANO:  Good morning, Your Honor.  Michael Romano

 9     on behalf of the United States.

10              THE COURT:  Good morning, Mr. Romano.

11              MR. ABBENANTE:  Good morning, Your Honor.  Thomas

12     Abbenante on behalf of Ms. Dillon.  Ms. Dillon is present, and

13     Ms. Dillon agrees to proceed by video pursuant to the CARES Act.

14              THE COURT:  All right.  Good morning, Mr. Abbenante

15     and Ms. Dillon.

16         And I see we have Ms. Reichler from probation as well.

17     Thank you for joining.

18              PROBATION OFFICER:  Good morning, Your Honor.

19              THE COURT:  Mr. Abbenante, so that I can make the

20     appropriate finding under the CARES Act, can you give me some

21     specific reasons why it's appropriate to proceed and not delay

22     this matter further without a serious harm to the interest of

23     justice?

24              MR. ABBENANTE:  Well, Your Honor, my client is about

25     an hour away from the court.  She currently at this point has
```

1    made the decision, based on her religious beliefs and other

2    reasons, not to be vaccinated.  I am -- she would be concerned

3    having to come into the courthouse and to travel on any kind of

4    public transportation under those circumstances.  And so that

5    is -- those are primary reasons why we're requesting to proceed

6    in this manner.

7              THE COURT:  All right.  Thank you, Mr. Abbenante.

8         In light of the pandemic and the numbers associated with

9    COVID and the defendant's concerns about travel, consistent with

10   the CARES Act and the Chief Judge's standing order relating to

11   the pandemic, I do find it's appropriate to proceed by video

12   today.

13        I've reviewed the final presentence report and

14   recommendation.  I've also reviewed the parties' sentencing

15   memoranda, including both parties' supplemental filings.

16        Mr. Abbenante, have you reviewed the presentence report

17   with Ms. Dillon?

18              MR. ABBENANTE:  I have, Your Honor, and I provided her

19   with a copy of it, too.  She has it, too.

20              THE COURT:  All right.  Thank you.

21        So Ms. Dillon, have you read the presentence report and had

22   adequate time to talk to your attorney about it?

23              THE DEFENDANT:  Yes, Your Honor.

24              THE COURT:  And have you had a chance to correct any

25   errors in the report?

```
 1              THE DEFENDANT:  Yes, Your Honor.

 2              THE COURT:  And Mr. Abbenante, do you have any

 3    unresolved objections to the presentence report?

 4              MR. ABBENANTE:  No, Your Honor.  There were just some

 5    minor things that -- concerning biographical information, and

 6    those were, you know, quickly resolved.

 7              THE COURT:  All right.  So there are no remaining

 8    factual inaccuracies in the report?

 9              MR. ABBENANTE:  No, Your Honor.

10              THE COURT:  Mr. Romano, how about the government?

11    Does the government have any objections to the report?

12              MR. ROMANO:  No objections.

13              THE COURT:  Okay.  Ms. Reichler, I see in paragraph 7

14    on page 3 and I think perhaps elsewhere in the report it states

15    that the defendant is pleading guilty to Count 4.  I believe

16    it's actually Count 1 of the superseding information.

17         Is that correct, Counsel?

18              MR. ROMANO:  One moment, Your Honor.

19              THE COURT:  She pled, I think, to the superseding

20    information.

21              MR. ROMANO:  She did, and I'm pulling up the

22    superseding information now.  Yes, you're right, it is Count 1.

23    When we superseded, we just included the one count.

24              THE COURT:  All right.  Ms. Reichler, can you make

25    those corrections?
```

1        PROBATION OFFICER:  Yes, Your Honor, I would be happy

2    to.

3        THE COURT:  Anything else, Mr. Abbenante?

4        MR. ABBENANTE:  No, Your Honor.

5        THE COURT:  Okay.  With those edits relating to the

6    charge, I will accept the presentence report as my findings of

7    fact pursuant to Rule 32 of the Federal Rules of Criminal

8    Procedure.

9        As all of you know, the sentencing guidelines do not apply

10   in this case, and that is because the offense to which

11   Ms. Dillon has pled guilty to is a Class B misdemeanor.  The

12   guidelines don't apply pursuant to Section 1B1.9 of the

13   sentencing guidelines.

14       Therefore, the Court will consider the factors set forth in

15   Title 18 United States Code Section 3553(a) to decide the

16   appropriate sentence in this case.  I'm not going to state all

17   of those factors here on the record now, but I am familiar with

18   them, and I will consider each of them, even if I don't address

19   them all during this hearing.

20       All right.  Mr. Romano, if I can hear from the government

21   first.  The government has reserved its right to allocute fully

22   here at sentencing.  I've reviewed both your initial and your

23   supplemental filing.  You can assume I'm familiar with both.

24       Before you start, though, let me just ask you, are there

25   any identifiable victims who seek to be heard here?

1          MR. ROMANO:  No.

2          THE COURT:  And is the restitution amount, the $500

3    restitution amount, is that the amount that the government is

4    seeking from all January 6 Capitol defendants?

5          MR. ROMANO:  Not from all, Your Honor, but I believe

6    that is the amount that we have been seeking in misdemeanor

7    cases.  In felony cases where there -- I believe in felony

8    cases, the amount we have been seeking generally has been

9    $2,000, but it may be more in instances where we have specific

10   evidence connecting a defendant to specific property destruction

11   rather than the general damage caused to the Capitol or to a

12   specific assault that resulted in a sort of identifiable harm to

13   a particular victim.

14         THE COURT:  All right.  Thank you.

15         MR. ROMANO:  All right.  Your Honor, I want to start

16   by addressing what I think was the motivating question behind

17   the Court's request for us to file a supplemental pleading on

18   Monday, which was a question about disparities in sentencing

19   between different defendants in connection with the Capitol

20   riot.

21        As I'm sure the Court knows, the rioters' conduct, when

22   looking at the riot on January 6 writ large, covers a fairly

23   broad spectrum.  There are more than 600 defendants that have

24   been charged.  Those charges range from misdemeanors to violent

25   felonies.  There's certainly a large spectrum of conduct when

1    looking at the defendants altogether.

2        But even among misdemeanor defendants, there are certainly

3    differences, differences in whether people entered the Capitol,

4    how long they were in the Capitol for, when they entered,

5    conduct within or outside.

6        And there's a fairly small pool of cases that have gone to

7    sentencing so far.  In the chart that we appended to our

8    submission, I believe there were 23 cases that we've identified

9    that have gone to sentencing.  22 of those are cases resolved

10   with misdemeanor charges.  And even looking at those cases, when

11   we look at specific factors and Ms. Dillon's conduct, the pool

12   of comparable cases, I think, shrinks even beyond that, as we

13   discussed in our submissions.

14       Looking at the conduct in this case and the factors in this

15   case, the government submits that there are really two things

16   that are especially significant.  One is an attempt to enter the

17   Capitol at a time when there was a crowd that was seeking to

18   move past that police line as opposed to an attempt to enter the

19   Capitol, for instance, after a point of access had already been

20   breached, and second, the text messages that Ms. Dillon sent to

21   somebody else who went to the riot on January 6.

22       The attempt to enter with other people is significant,

23   because there are certainly other defendants who, while they --

24   when they entered, they would have seen broken glass, they would

25   have seen overturned police barriers, there wasn't police

1    resistance at the point of entry as there was here.

2         And now, I want to stress, we don't have any evidence to

3    show that Ms. Dillon assaulted or physically resisted police,

4    but there were people around who were trying to get in through

5    that door.  And the video evidence shows that Ms. Dillon worked

6    her way through the crowds in an effort to get to that door.

7    This was not a case where she was carried across the threshold

8    by a group of people.  This was not a case where there was a

9    sort of delayed entry where she was unable to see what was

10   happening at the front.  There were people that were near her

11   who were jockeying with police officers.  And I believe although

12   the view is somewhat obstructed, that there were police officers

13   outside the door who were engaging with other rioters, who were

14   deploying pepper spray.  I think that's how Ms. Dillon got

15   pepper spray in her eyes, as she reported.

16         THE COURT:  Mr. Romano, sorry to interrupt, but has

17   the government provided this video, or are you just speaking

18   about what you've reviewed yourself?  I don't see it -- it's not

19   on the docket.

20         MR. ROMANO:  I'm speaking about what I've reviewed.  I

21   realized I hadn't provided that video, and I'm happy to share my

22   screen and play it.  The clips are only about one minute long,

23   and there are two cameras that are relevant.

24         THE COURT:  Mr. Abbenante, what's your position on

25   that?

1      MR. ABBENANTE:  Your Honor, Mr. Romano has been

2  completely open with discovery.  We've seen it, and Ms. Dillon

3  has seen it.  And in fact, initially when we were discussing a

4  resolution of this case, I pointed out to Mr. Romano that the

5  evidence, at least from my point of view and also Ms. Dillon's

6  point of view, that she never actually crossed the threshold of

7  the building.

8      So yes, we've seen it, and I don't have any objection to

9  you seeing it.

10     THE COURT:  All right.  Mr. Romano -- sorry?

11     MR. ABBENANTE:  It's not that long, Judge.

12     THE COURT:  All right.  Mr. Romano, I imagine there

13  are folks listening in who can't view the video, and since the

14  government hasn't, can it upload it to whatever system it has

15  been placing such videos in so that the public can have access

16  to it?

17     MR. ROMANO:  I certainly can, and we do not object to

18  making public these two videos.

19     THE COURT:  Mr. Abbenante?

20     MR. ABBENANTE:  I really don't have an objection to

21  the video, but my client is always concerned that the more stuff

22  that's out there associated with her name continues to cause

23  problems for her and her family.  I don't have any problem with

24  the posting of the video if there's some way to redact

25  Ms. Dillon's name from the video.  I don't know --

1          MR. ROMANO:  The video itself doesn't contain her

2     name.  I mean, certainly, videos disseminated in connection with

3     this case, people who are observing the case or trying to

4     research it might note the connection, but the video doesn't

5     show the names of any people.

6          MR. ABBENANTE:  As I said before, Judge, if you want

7     to see it, I have no problem.  Mr. Romano has accurately

8     described the video here today and also in the pleadings, but if

9     Your Honor wants to see it, no problem.

10         THE COURT:  All right.  And also, you don't object to

11    it being made available to the public?

12         MR. ABBENANTE:  No, Your Honor.

13         THE COURT:  Okay.  Mr. Romano, I think it might be

14    helpful for me to see it, because it wasn't clear to me -- from

15    what the parties wrote, it wasn't clear to me whether Ms. Dillon

16    actually was sprayed with pepper spray, and it wasn't clear to

17    me -- I know that the government has not alleged that she

18    assaulted any officers, but it was hard for me to understand if

19    she was pushing back against the officers.

20        There was contact, correct, between the two?

21         MR. ROMANO:  I am not 100 percent sure from my review

22    of the video if there was contact.  She sort of fell at the

23    threshold of the building and stood back up, and there certainly

24    could have been contact there.  But as she then tried to get in,

25    there were other rioters who the police were trying to get out

1    of the building.  And so as that crowd moves forward, there's

2    some officers that kind of step out of the threshold, there's

3    some rioters that step out of the threshold, and there was

4    certainly contact between Ms. Dillon and other members of that

5    group.  It is just hard to say with certainty that the contact

6    is between her and a police officer.

7         THE COURT:  So what makes her eventually turn away?

8    Does she do it on her own, or is she prevented from entering

9    and, therefore, gives up?  What's the government's -- I want to

10   see the video, but what is your position on that?

11        MR. ROMANO:  Well, I don't know that I can assess for

12   certain.  In her text messages, she reported getting pepper

13   sprayed and being unable to see for a period of time.  And based

14   on the video, it does appear there's some engagement with police

15   officers and other rioters outside the building.  So it is

16   certainly possible that she was pepper sprayed.

17        What I would submit as the most likely explanation is the

18   combination of falling to the ground and pepper spray in the air

19   made her decide to leave.

20        THE COURT:  And I think she also alleged, at least in

21   text messages, that she was tear gassed?  Am I remembering that

22   correctly?  Pepper sprayed and tear gassed?

23        MR. ROMANO:  I think that it's probably just the one,

24   and it was probably spray and not tear gas.  Based on the

25   staircase and the position in the Capitol, I don't think this

1    was an area where the police deployed, say, a tear gas grenade.

2            THE COURT:  I understand that, but did she not say in

3    her text messages that she was pepper sprayed in the eyes and

4    tear gassed three times?

5            MR. ROMANO:  I think that's right.

6            THE COURT:  And that the officers tried to beat her

7    with batons?

8            MR. ROMANO:  She did say that.  I'm skeptical about

9    whether that's accurate.

10           THE COURT:  All right.  Mr. Romano, yes, it would be

11   helpful to see the video clip.

12           MR. ROMANO:  All right.  Bear with me for just a

13   moment, Your Honor.  As I am looking at sharing my screen, there

14   are a few too many windows open for the video to pop up as an

15   option.  I'm just closing some other things.

16       Okay.  Your Honor, can you see this video?

17           THE COURT:  Yes.

18           MR. ROMANO:  All right.  I'm going to hit play.  Just

19   to orient you before we start, you will see Ms. Dillon approach

20   the middle of the doorway, and then it appears she falls to the

21   ground.

22       (Video recording played.)

23           MR. ROMANO:  And there she is.  She's fallen.

24       I'm sorry.  Were you asking me to pause, Your Honor?

25           THE COURT:  I had a hard time spotting her.

1      MR. ROMANO:  Okay.  I'm going to back up a few

2  seconds.  Now we're at 18 seconds.  She is the figure, the

3  blonde woman a little bit shorter than other members of the

4  crowd who right now is kind of in the middle of the crowd near

5  the door.  Her head is near the American flag that's off to the

6  right-hand side of the door.

7      THE COURT:  It's in between the flag and the red --

8  the individual with the red hat?

9      MR. ROMANO:  Yes.

10  (Video recording played.)

11      MR. ROMANO:  And there she's fallen.  And there it

12  looks like she's trying to maintain her position or move

13  forward.  There's a crowd of other people are funneled out of

14  the door.

15    I'm pausing, too, Your Honor.  This was somewhat obstructed

16  by the left-hand door that you can see police trying to close,

17  but on the outside past the door, you can see officers in riot

18  gear, one with a protective face shield, who just came into view

19  and before the door closed.  I'll back it up slightly.  And

20  those -- that officer and some others just out of view, I

21  believe, were engaging with other rioters who were outside.

22    (Video recording played.)

23      THE COURT:  So did the officer to the left have a

24  baton?

25      MR. ROMANO:  I'm not sure, Your Honor.  It would not

1    surprise me if he did.

2              THE COURT:  All right.

3              MR. ROMANO:  And there's another video from outside

4    that I can play.  It's from the outside looking in the same

5    door.

6         (Video recording played.)

7              MR. ROMANO:  So now you can see Ms. Dillon just enter

8    the bottom of the frame and move toward the door.

9              THE COURT:  It's difficult to see much with the flag.

10             MR. ROMANO:  Right.

11             MR. ABBENANTE:  You just saw her fall there, Your

12   Honor.

13             THE COURT:  I wish I could see it.  I take your word

14   for it.  It's very difficult to see much from this angle.

15             MR. ABBENANTE:  Mike, can you point to her?  There's

16   her head in the middle.  Do you see it?

17             THE COURT:  Yes.

18             MR. ROMANO:  I will back up just a little bit.

19        Yes, you can definitely see her head in the middle right

20   there, the blonde hair kind of right in front of the break

21   between the two -- the closed door and where the other door was

22   closed.

23        And over to the right again blocked by the pillar, you can

24   see what looks like a police officer in a gas mask, although

25   that could be another rioter.

1          THE COURT:  All right.

2          MR. ROMANO:  So it is difficult from the angles of the

3     camera to get a good view on what the police did, as you can

4     see, Your Honor, and to get a good view on exactly the level of

5     police engagement with the rest of the crowd, when pepper spray

6     or tear gas, as Ms. Dillon put it, may have been deployed, or

7     when batons may have been used against members of the crowd.

8          THE COURT:  Regardless, she was very much engaged,

9     both verbally and physically, whether she assaulted them or not.

10         MR. ROMANO:  Right.  It's not clear from the evidence

11    that any sort of assault happened, but it is clear that she was

12    trying to enter the building and that she was trying to at the

13    very least maintain her position as the -- as people were

14    leaving the Capitol and as the crowd was surging and trying to

15    get into the building.

16        So that is definitely an important piece of the conduct,

17    Your Honor, that the government submits makes Ms. Dillon's case

18    more comparable to other cases where misdemeanor defendants,

19    although they may not personally have committed assaults or

20    property destruction, nonetheless were a part of a crowd that

21    overwhelmed a police line elsewhere in the Capitol.  This police

22    line here was not overwhelmed, probably in part due to the tight

23    nature of the access point -- there wasn't really a lot of room

24    for a crowd to gather around the door -- and probably in part

25    due to police engaging with rioters on the outside.

1    We also submit that the text messages that we highlighted

2    in our sentencing submissions make this case somewhat different

3    from other cases.  We look at these text messages both to assess

4    the seriousness of the conduct, to give us some sense of why a

5    defendant was at the Capitol, why they carried out the conduct

6    that they did, but also to look at the possibility of recidivism

7    and the need for deterrence.

8        And what we can see here is that even if Ms. Dillon did not

9    stay beyond the point where this video was taken, left shortly

10   thereafter, even if she was dissuaded from further conduct by

11   the presence of some type of chemical or possibly getting hit or

12   made contact with as the crowd was surging against police, she

13   anticipated that this day, January 6, and the certification of

14   the Electoral College vote was connected with what she saw to be

15   some kind of violent showdown between the two different forces

16   in American life.

17       And she talked about the government being infiltrated by

18   Congress.  She talked about a civil war.  She talked about the

19   coronavirus pandemic and the restrictions put on people as a way

20   to prep her side for lockdowns, restrictions, disruptions in

21   supply.

22       And this is the sort of thing that is troubling as it

23   speaks to her conduct, but also troubling as far as looking

24   ahead to whether there is a possibility of further participation

25   in an event like this.

1          In our sentencing submission, Your Honor, we stress that

2     this riot is a sui generis one-of-a-kind case, and it certainly

3     is when compared to other cases we prosecute.  But that doesn't

4     mean that the danger of the riot has passed just because

5     January 6 has passed.  The danger, the government submits, is

6     ongoing and can recur, especially if there is inadequate

7     deterrence when events like this come up again, when there are

8     further elections, when there are further certifications of the

9     votes.  The danger --

10          THE COURT:  So along those lines, Mr. Romano, why is

11     the government in this case only seeking probation for three

12     years as opposed to a longer period past, for example, the next

13     election?

14          MR. ROMANO:  Well, given the sentences that we have

15     requested in other cases and the -- that much time of

16     supervision represents, we think that three years is a

17     reasonable sentence for the Court to impose.  If the Court

18     wanted to impose a sentence of probation until the next

19     election, I think that's certainly the Court's prerogative, and

20     we would not necessarily object to that.

21          THE COURT:  Mr. Romano, help me understand the

22     government's position.  As it appears to the Court based on your

23     submission, it seems like the government has kind of a standard

24     recommendation it's making in these misdemeanor cases in which

25     there is not clear evidence of an assault or property damage,

and that is, the government is recommending three years'
probation, some period of community service, some period of home
confinement, and $500 in restitution.  Is that fair?

MR. ROMANO:  That's generally fair, yes.  I think
that's been a fairly consistent recommendation in a number of
these cases.

THE COURT:  And yet, you do -- despite the
recommendations you've made in other cases, you do distinguish
this from the Bustle case, for example.  You compare it to
Bennett and Vinson and argue that in some ways this case is more
aggravated, in other ways less.  So I'm just kind of curious.
The government's sort of taking a broad approach with these
nonassault, nonproperty damage misdemeanor cases, correct, and
just kind of an even approach across the board even though
you're arguing in your sentencing memoranda that the Court
should distinguish in certain ways from these cases in which the
government's made the same recommendation.

MR. ROMANO:  I don't think our recommendation has
always been the same, and I would note, too, that there are --
on the third page, the cases where we've recommended some period
of incarceration, all but one of those cases are misdemeanor
cases as well.  There's the Hodgkins case, which Mr. Hodgkins, I
believe, made it into the Senate floor, was in the building for
a prolonged period of time, and was charged with intent to
obstruct Congress.

```
 1           But the other cases on that list are cases where we were
 2    recommending some period of incarceration even for a misdemeanor
 3    defendant.  Some of those are -- I'm sorry, Your Honor.
 4           THE COURT:  I just want to understand, is it -- am I
 5    correct that the cases that the government thinks this case is
 6    most analogous to would include the Bustle case in which you've
 7    argued here the facts are more aggravated, the Vinson cases, and
 8    Bennett?  Are those the primary ones?
 9           MR. ROMANO:  Yes, that's fair.
10           THE COURT:  Okay.  And, you know, in Bustle, am I
11    correct, you made the same recommendation as you're making here?
12           MR. ROMANO:  For Jessica Bustle, yes, not for her
13    husband.  Her husband, we recommended one month of home
14    detention.
15           THE COURT:  Okay.  And the Bustle case, I think, was
16    the Hogan case; correct?
17           MR. ROMANO:  Yes, Judge Hogan presided over that one.
18           I would add, too, Your Honor, that the sentence in Bustle
19    was handed down before we drafted our sentencing memorandum
20    here.  So I'm not saying definitively that the recommendation
21    might have changed if the sentence in Bustle had changed, but
22    certainly seeing what Judge Hogan did in Bustle and what was
23    done in other cases has informed our thinking on this case and
24    other cases that came after that one.
25           THE COURT:  All right.  And in Bennett, I believe
```

1  Judge Boasberg imposed a sentence of 24 months' probation, as

2  did Judge Hogan in Bustle; correct?

3           MR. ROMANO:  I believe that's right, yes.

4           THE COURT:  And both of them imposed some period of

5  home detention or home incarceration?

6           MR. ROMANO:  Yes.

7           THE COURT:  And then in the Vinson cases, I think

8  Judge Walton imposed five years' probation; is that right?

9           MR. ROMANO:  Yes, and also a pretty substantial fine,

10 I believe.

11          THE COURT:  Right, a fine.  But in this case no one

12 disputes Ms. Dillon doesn't have the financial resources to pay

13 a fine?

14          MR. ROMANO:  Right.

15          THE COURT:  Walton did impose five years' probation

16 but no period of home incarceration or home detention; correct?

17          MR. ROMANO:  That's right.

18          THE COURT:  All right.  Okay.  Thank you.  I just

19 wanted to make sure I was accurately understanding your position

20 in this case relative to those other cases.  You think it

21 falls -- it's most analogous to those three cases, and it's more

22 egregious than the Bustle case?

23          MR. ROMANO:  That's right.  And also, just as I

24 distinguished Jessica Bustle's sentence from Joshua Bustle's

25 sentence, I think it's also important to point out, as I'm sure

1    the Court noticed, that we think this case is more comparable to

2    Thomas than Lori Vinson.  Thomas Vinson was the defendant for

3    whom we recommended probation with a period of home confinement.

4    Lori Vinson's conduct was substantially different in that she

5    submitted to a number of news interviews where she talked about

6    being in the crowd participating in the riot and that she would

7    do it again.  We thought that conduct was more egregious and

8    merited a sentence of incarceration.  Obviously, Judge Walton

9    imposed a different sentence than what we recommended there, but

10   we are specifically comparing this case to Thomas Vinson's case.

11           THE COURT:  Okay.  All right.  Go ahead, Mr. Romano.

12   I didn't mean to cut you off.

13           MR. ROMANO:  No, that's completely fine.

14       So Your Honor, I was nearing the end of my argument anyway.

15   For all those reasons and the reasons that we stated in our

16   memorandum, we submit that a sentence of three years of

17   probation with a three-month period of home confinement and the

18   other conditions we have laid out balances the different 3553(a)

19   factors and represents a sentence that will reflect the nature

20   and seriousness of the offense for deterrence, will take into

21   account the history and characteristics of this defendant, and

22   also promote a -- promote respect for the law and provide just

23   punishment.

24           THE COURT:  All right.  Thank you, Mr. Romano.  Let me

25   ask you one last question.

1          MR. ROMANO:  Certainly.

2          THE COURT:  In the interview that Ms. Dillon had with

3     law enforcement officers following her plea in this case, I

4     think she was asked about her -- well, wait.  I'm not sure

5     whether this was in the texts she had with the other individual

6     who was involved in the Capitol attack or whether this was

7     actually in the interview.  I thought it was in the interview.

8     But she talked about deleting her Instagram account because

9     other online accounts of hers had been hacked?

10         MR. ROMANO:  Yes.

11         THE COURT:  Can you shed any light on that?  Do you

12    have any evidence to that other than her own statement?

13         MR. ROMANO:  We knew before the fact that her

14    Instagram account had been deleted.  I don't have other evidence

15    about other accounts being hacked.  She was speaking about bank

16    accounts specifically there.  And I didn't want to go into a lot

17    of detail about that, but she was not talking about social media

18    accounts being hacked.  She was talking about bank accounts and

19    other apps on her phone, I believe.  And so she also, according

20    to her, decided to take down her Instagram account.

21         THE COURT:  And that was the day after January 6?

22         MR. ROMANO:  I don't know that it was the day after

23    January 6.  It was shortly after January 6.

24         THE COURT:  Okay.  But the government doesn't have any

25    independent evidence, aside from her own statements, to support

1    that?

2            MR. ROMANO:  To support why she took down the

3    accounts?  No.

4            THE COURT:  And the hacking of bank accounts and other

5    social media accounts.

6            MR. ROMANO:  Correct.

7            THE COURT:  Okay.  All right.  Mr. Abbenante, I've

8    also reviewed your filings, and I do want to give Ms. Dillon an

9    opportunity to make a statement after I hear from you first if

10   she desires to do so.

11       But as I mentioned during our last status hearing, our

12   telephonic hearing that we held before I decided to continue the

13   sentencing hearing in order to get more information from both

14   sides, as I mentioned before, I am troubled by the statements

15   Ms. Dillon made both before the Capitol attack and shortly after

16   and then even later after she pled guilty in this case in her

17   interview with law enforcement agents, her statements before

18   January 6 about the new administration stealing the election,

19   about the Democrats shutting the country down and letting the

20   U.N. and China take over, her statements just after the attack

21   calling the officers who defended the Capitol devils, her later

22   statements in the post-plea interview in which she stated that

23   she stayed at the Capitol so that the United States would not

24   end up without free speech like China.

25       She also said she didn't talk to the other rioter about the

1  presidential election, which her texts show clearly isn't true.

2  She also said she tried to keep the conversation silly and

3  lighthearted with him.

4  None of this rings true to me, and it does make me wonder

5  whether there's a real risk that she will continue to engage in

6  this kind of unlawful conduct in the future.

7  So can you speak to that, and can you also tell me what she

8  meant when she said during her post-plea interview with law

9  enforcement agents that she only supported violence in extreme

10 circumstances, like the Revolutionary War, and sort of the

11 implication being this was that, January 6 was that.  All of

12 those statements give me great concern.

13 MR. ABBENANTE:  Your Honor, I don't -- there's really

14 no defense to any of those statements.  They're her -- the

15 statements that she made concerning the election, the statements

16 that she made concerning China, many people still believe those

17 facts, that those are true facts.  After a recent rally that

18 former President Trump had, two people, I saw on the news, were

19 interviewed, and I was sort of shocked because they said the

20 exact same things that Ms. Dillon said.

21 THE COURT:  She is certainly entitled to her views,

22 but here, she took those views, and she engaged in violent

23 conduct and unlawful conduct, and that combination is extremely

24 concerning.

25 MR. ABBENANTE:  I understand that, and Ms. Dillon

understands that.  She is entitled to her views, but she is not

entitled to do what she did in this case.  And she regrets it.

        I've been doing this for over 40 years, and I think that I

have a pretty good sense in dealing with my particular clients

to determine whether or not someone is just trying to get over

on the Court or get over on the Probation Department or the

government and whether or not they're truly sorry for what they

did.

        Ms. Dillon truly is sorry for what she did here.  She

regrets saying those things.  She regrets even coming to the

Capitol.  As the government pointed out, she didn't come here

with any weapons.  I think she just got caught up in the entire

speeches and went up to the Capitol --

        THE COURT:  But you say that, Mr. Abbenante, and you

said that in your filing as well, that she, you know, quote, got

caught up in the moment.  But as Mr. Romano has pointed out, her

text messages suggest that she went to D.C. clearly anticipating

violence and clearly willing and interested in becoming a part

of that violence, and in fact, her actions bear that out.

        So I view her case differently than those who decided to

attend the rally and then also decided to walk down to the

Capitol.  It seems to me, based on her texts before this event,

that she clearly anticipated something very different, and this

was not a surprise to her, and this was really what she went to

D.C. to do.

1          MR. ABBENANTE:  Well, she says that that's not the

2     case, and then I have to just rely on what she says.  And she

3     will tell you -- when she makes her statement to the Court, she

4     will explain what was going through her mind at that time.

5          But I can't defend her text messages, and all I can say

6     about them is that they were thoroughly vetted by the

7     government.  As I explained in my memoranda, the individual that

8     she was texting with came into her church, befriended her and

9     her father.  Both of them exchanged text messages with this

10    individual.  We don't deny it.  We don't deny anything the

11    government is saying concerning the content of those messages.

12         But once they were -- the father was interviewed about

13    those text messages, and no other charges were brought against

14    the father or Ms. Dillon.

15         THE COURT:  And just to be clear, Mr. Abbenante, I'm

16    not suggesting here by my questions that additional charges

17    should be brought based on her pre-offense texts.  What they do,

18    though, is they inform her intent with these actions.  And, you

19    know, arguably, what she said to law enforcement agents could be

20    prosecuted as false statements.  I don't find that the

21    statements that she made to them ring true in light of the text

22    messages that the government has represented were made.  But the

23    government has not made a decision to charge those.

24         It's just, in assessing her degree of remorse, this is

25    after arrest, this is after plea.  In an interview with law

1    enforcement, even at that time her statements seem very much

2    separated from reality and her own conduct, and that too

3    troubles me.

4              MR. ABBENANTE:  Well, I can't argue with that, because

5    they do seem to be that way.  All I can tell you is that from my

6    observations and my discussions with Ms. Dillon and when she was

7    interviewed by the Probation Department, I truly believe that

8    she is sorry for what she did and that this is not going to ever

9    happen again.

10             THE COURT:  All right.

11             MR. ABBENANTE:  And -- I'm sorry.  Go ahead.

12             THE COURT:  Mr. Abbenante, you are suggesting that the

13   Court impose probation without any conditions, and if I were to

14   impose any conditions, that they be restricted to community

15   service.

16      In light of what's on Ms. Dillon's plate in terms of caring

17   for her daughter, her disabled uncle, her husband's grandfather,

18   her -- I think it's her nephew who has disabilities, to me that

19   doesn't make a lot of sense.  That's not what she needs.  She

20   may need part-time work, and to the extent she has extra hours,

21   it seems to me her efforts would be better directed in that way,

22   seeking employment, than community service, although I certainly

23   value community service.  But I'm just concerned, given what she

24   has on her plate, that she may not be able to do both, and it

25   seems like a job would be helpful to her.

1        MR. ABBENANTE:  Well, Your Honor, I can tell you this:

2   Ms. Dillon is the one who suggested that I make that

3   recommendation to the Court in terms of the hours of community

4   service, because she feels that that would demonstrate how sorry

5   she is about this.  And although it may be a hardship to her,

6   over a period of two years' or three years' probation or

7   whatever if Your Honor were to go that way, she thinks she could

8   do that on weekends, on one weekend day a week.

9         THE COURT:  Is she also continuing to pursue

10   employment?

11         MR. ABBENANTE:  She is trying to pursue part-time

12   employment, as she has in the past.  She periodically has had

13   part-time employment, and there have been no issues with that.

14   At this point in time while this case has been pending, she has

15   been reluctant to actually apply for jobs because most of them

16   ask whether or not you've got a conviction or whether or not

17   you've got any kind of cases pending and things of that nature.

18   So she hasn't pursued that type of, you know, regular employment

19   while this case is pending.

20      But as her prior record of employment indicates, this is

21   not a woman who doesn't want to work.  She's just decided that

22   while this case is pending it's best that she just basically lay

23   low and just wait until this case is resolved.

24         THE COURT:  All right.  Mr. Abbenante, I also want to

25   flag for you, to the extent you want to respond, I am

considering, based on the presentence report and, in particular, paragraph 48, a special treatment condition.

MR. ABBENANTE:  I talked to her about that, and she, you know, feels that she's been able to deal with the various issues through her interaction with her church and the people that support her there.  But I certainly don't have an objection if Your Honor deems it appropriate to order any kind of special treatment.  She may very well benefit from this because this has been a traumatic experience for her.  And I don't really think -- I mean, I know it's set in, but I don't think that's a bad suggestion.

Again, I'm not trying to make it personal, because it's not personal to me, but what I can say is this:  You know, when I started practicing, I started as a student attorney.  I represented a lot of people in disorderly conduct cases.  And then when I started my practice in Superior Court, I've done so many diversion cases.  And even through the federal -- while I've been practicing more recently in the federal court than the state court, I've seen cases like this where people like Ms. Dillon who have no prior record, where the Probation Department is recommending probation, where the government is recommending probation, we're in agreement with that.  The only thing that we were in sort of disagreement or not in step with was the conditions of probation.

I understand Mr. Romano's argument.  I understand what

1    Judge Hogan and the other judges did when they imposed a period

2    of home confinement.  I just feel that that is -- that's all

3    right, I get it, but I thought that the community service would

4    be a way for Ms. Dillon to demonstrate how sorry she is for what

5    she's done.

6        And when I cited the Bustle case, at that time it was the

7    closest case that I could find that sort of mirrored her

8    conduct.  But when Mister -- and the other ones that I cited, I

9    thought that those were sort of worse than Ms. Dillon.  But the

10   ones that Mr. Romano pointed out in his memorandum I think even

11   further support why Ms. Dillon is a good candidate for probation

12   and that the recommendation is in step with other cases.

13             THE COURT:  So, Mr. Abbenante, to be clear, if I

14   impose a home confinement-like condition, I would be imposing

15   something like home detention where I would expect that she

16   would be out and about trying to find employment to the extent

17   she couldn't perform community service.

18       But given the demands on her with her family, I agree with

19   you, I think being locked down in the home is not necessarily

20   productive, assuming, of course, she's engaged in other

21   constructive things.  But when she's not, it seems to me there

22   should be a period of time when she's in the home but for those

23   constructive things.

24             MR. ABBENANTE:  I really don't have any problem with

25   that.  I just think Your Honor sees from the report that what

1   she -- as long as she's allowed to attend church, as long as she

2   is allowed to pick up her nephew from school --

3          THE COURT:  Seek treatment, et cetera, yes.

4          MR. ABBENANTE:  -- and also, you know, go grocery

5   shopping for her family and take care of her grand -- I think

6   sometimes she has to take either the uncle or the grandfather to

7   medical appointments.  As long as those things are unrestricted,

8   again, we don't have any objection to it.

9          THE COURT:  Well, it's not that they would be

10  completely unrestricted.  It's just that probation would be

11  aware of what she's doing and approve what she's doing.

12         MR. ABBENANTE:  And as the Pretrial Services has

13  indicated, as Ms. Dillon has shown, she's been completely

14  compliant with all the conditions that Pretrial has placed on

15  her.  And many times, she was traveling from her house to

16  Baltimore to meet in person with the Probation Department, and

17  she met all those appointments.  She did it all.

18         THE COURT:  All right.  Mr. Abbenante, anything else?

19         MR. ABBENANTE:  No, no, Your Honor, but I do think

20  that Ms. Dillon has something that she would like to say.

21         THE COURT:  All right.  Thank you.

22     So Ms. Dillon, this is your opportunity to make a statement

23  today if you choose.  You don't have to, but you have the right

24  to make a statement if you would like to.

25         THE DEFENDANT:  Yes, Your Honor, and I thank you so

much for -- everyone here, the dignity I've been treated with and the fairness.

This day was the worst day of my life.  This does not line up with the rest of my life, you know.  I admit, I have strong beliefs, most definitely, but what I did was inexcusable and unacceptable.  I don't like upsetting people.  I don't like -- I have expressed before, I'm very private, and I don't like seeing people in pain.  I don't like seeing people hurt.  I admit that I was really passionate in the lead-up to that.

And there is no excuse for my actions by any means.  I was going through an incredibly difficult time with a loss.  And I tell you, my world view has changed so much.  Just since, I mean, even since July, I've experienced two more losses, and that's really shaped the way I see things because life is just so precious.

And just I do not want to do anything to create any misery or any unhappiness for any person ever, and I am so truly sorry for my choices.  So much of that day just comes in flashes, and it was just so -- emotions and everything going on around me in my personal life and then what was happening in the country and things, it was so overwhelming.  And it's a lot of times even very hard to remember, because it's just painful and traumatic.

I never want to set foot in Washington, D.C., again, and I love that city, and I have beautiful memories with my family in that city, and I will never step foot in it again because I do

1    not -- I don't want to think about that day.  It's horrible.

2    And I just don't want to -- I am so -- I wake up in a panic some

3    mornings because I'm so troubled about what I did, thinking of

4    like what this would mean for my family, what this would mean

5    for me in my future.  Because I don't have a college education,

6    and I don't have those things, that it's like I just blew my

7    whole life, I just blew my whole future.  And it takes a lot to

8    even calm down when I think about it, you know, because it's

9    just so much.

10        And I -- this moment has just -- this moment right now has

11   played in my head because I'm not very good at explaining my

12   thoughts and my feelings sometimes, and I am just so truly sorry

13   to be a burden and create this problem for anybody.  I don't

14   want to ever do anything again.  I want to obey the law, and

15   I've shown that before, and I would like to continue being that

16   person I was before January 6, which was never breaking the law.

17           THE COURT:  All right.  Thank you for your remarks,

18   Ms. Dillon.  I can imagine that this has been a traumatic event

19   for you, and I hope, genuinely hope that you will take advantage

20   of the kind of treatment services that will be offered to you

21   while you are on probation.

22        I am inclined to impose a sentence of probation in this

23   case with a period of home detention and require you to seek

24   employment and to the extent you're unable to obtain it, do

25   community service.

1    But there are many lawful and productive ways to channel

2    your frustration over the government and what's going on in this

3    country, and you have lived an otherwise lawful and law-abiding

4    life here.  This one mistake doesn't have to define you, but

5    perhaps the way in which you respond to this mistake can define

6    you.

7    So again, I am going to encourage you to learn from this

8    and take advantage of the services that will be offered to you

9    as a part of your conditions of probation.

10   Counsel for the government, for both sides, is there any

11   reason why sentence should not be imposed at this time?

12          MR. ROMANO:  No, Your Honor.

13          MR. ABBENANTE:  No, Your Honor.

14          THE COURT:  All right.  As I've already noted, I'm

15   required to consider the various factors outlined in Title 18

16   United States Code Section 3553(a).  Again, I'm familiar with

17   those factors, and I'm considering them all here.

18   Beginning first with the nature and circumstances of this

19   offense, although this is a misdemeanor offense, it is

20   nonetheless a very serious one.  Ms. Dillon has admitted that

21   she was a part of a large crowd that breached the U.S. Capitol

22   on January 6 of this year.  At that time members of Congress had

23   gathered to certify the vote count of the Electoral College for

24   the 2020 presidential election, as had the vice president.

25   Despite the presence that day of many Capitol police

officers and barricades around the exterior of the Capitol

building, a crowd of hundreds, including Ms. Dillon, forced its

way through barricades and through Capitol police.  Although

Ms. Dillon did not enter the building, many did through locked

doors and windows of the Capitol building.  As a result, members

of Congress, as well as Vice President Pence who was present,

were forced to evacuate the Senate and House chambers.

It's estimated that on that day there was more than

$1.4 million in property damage done to the Capitol building.

Although there's no evidence in the record that Ms. Dillon

herself damaged property or injured any Capitol police officers

or others, she was very much a part, as the government has

described and the videos have shown, of the initial and violent

crowd.  Her actions that day contributed both directly and

indirectly to the violence and destruction of that day.

Ms. Dillon tried to enter the Capitol through the Senate

carriage door, and in doing so, as the video illustrates, she

pushed through a crowd before eventually falling near the

entrance.  After she fell down, she got up, seemed to engage

with law enforcement officers, verbally if not physically, but

she ultimately left the area, perhaps due to pepper spray or

some other chemical agent.

As we've discussed here, the evidence suggests that

Ms. Dillon went to D.C. that day expecting there to be violence

and intent on doing her part to stop Congress from fulfilling

its constitutional duty.  The attack in which she participated
was an attack on our institutions of government, the rule of
law, and our democratic process.

        When she tried to enter the Capitol, she knew full well she
didn't have any authority to enter the building.  She was, by
her actions, in no way exercising her First Amendment rights.
She was clearly trespassing.  And she not only violated the law,
she subjected career law enforcement officers whose job it is to
protect the Capitol, members of Congress, and others who were
present inside the Capitol that day, she subjected those
officers to great, great risk.  Though she didn't injure anyone,
the evidence before the Court is that more than 100 law
enforcement officers were injured that day as a result of this
violent attack.

        As I've stated, Ms. Dillon's online statements before and
after the attack, as well as her statements to law enforcement
agents after her plea are concerning to the Court.

        Considering next her history and characteristics, as found
by the probation officer, Ms. Dillon has no prior criminal
record.  She did, to her credit, accept responsibility early,
and by pleading guilty early, she saved the government and the
court resources.

        Ms. Dillon currently cares for her child and her husband's
disabled 64-year-old uncle and his 90-year-old grandfather.  All
of these individuals reside in the home with her and her

1    husband.  She also assists her sister-in-law in the care of her

2    autistic child.

3         Though Ms. Dillon is not working outside the home at the

4    moment, she has worked on and off consistently since her teenage

5    years.

6         Ms. Dillon has no history of drug or alcohol abuse.  She

7    has a number of health issues which are documented in detail in

8    the presentence report.

9         Looking at the range of sentences available here, this

10   petty offense has a maximum penalty of six months in prison, up

11   to five years' probation, a maximum fine of $5,000, and is

12   subject to a $10 special assessment.  As I've said, I don't

13   find, given Ms. Dillon's limited resources, that she has the

14   ability to pay a fine in this case.

15        We also discussed restitution, which Ms. Dillon has agreed

16   to pay, consistent with other similarly situated defendants.

17   She has agreed to pay $500 to defray some of the costs

18   associated with the January 6 damage to the Capitol.

19        Considering the need to avoid unwarranted sentencing

20   disparities, while it's certainly important to sentence

21   Ms. Dillon based on her individual conduct, Section 3553(a) does

22   require this Court to take into account the need to avoid

23   unwarranted sentencing disparities, and the guidelines

24   themselves usually aid judges in doing that, but those don't

25   apply here.  So the defense has provided the Court with

1    information relating to other similar Capitol cases in this

2    court, and I asked the government for the same information.

3    I've considered the aggravating and mitigating facts of this

4    case and compared them with the facts of those other cases, and

5    I've taken into account the sentences imposed by my colleagues

6    in those cases.

7        While no two cases are alike, several do have similar

8    facts.  The defendants in those cases were sentenced to

9    probation, some with community service.  Some received home

10   confinement.  Most of the cases cited by the government, or I

11   think all that are analogous to this case, the government has

12   made the same sentencing recommendation in each, and that is

13   that the defendant serve three years' probation with community

14   service and a short period of home confinement, plus pay

15   restitution.

16       I do agree with the government that what makes this case

17   aggravated compared to some of the other similar cases is the

18   fact that Ms. Dillon was clearly anticipating violence when she

19   arrived at the Capitol or in D.C. on January 6, and her

20   statements after the attack as well give the Court concern.  She

21   was also a part of the initial crowd that tried to enter the

22   building.  She seemed intent on, if not herself, supporting

23   those who were trying to halt the certification of the Electoral

24   College vote.

25       To her credit, as I've said, there's no evidence that she

injured any officers or that she committed any property damage.
Nonetheless, she did engage, it appears, physically and verbally
with the officers.

The defense has argued the facts of this case are
comparable in some ways to the case of U.S. v. Bustle, a case in
which Judge Hogan sentenced the defendant to 24 months'
probation with two months of home detention and 40 hours of
community service and $500 in restitution.

Again, I think this case is different in the respects that
have been noted.  Namely, Ms. Dillon anticipated violence ahead
of time, and her text messages before and since have been
disturbing.  She's also an early rioter who fought hard to get
in the Capitol.

The defense's comparison to Doyle and Ehrke is less
persuasive.

The government argues this case is like U.S. v. Bennett and
U.S. v. Vinson, at least one, Lori Vinson, I believe.  In
Bennett, Judge Boasberg imposed a sentence of 24 months'
probation and $500 of restitution.  In the Vinson case, the
government analogizes this to Judge Walton, who imposed five
years' probation, a $5,000 fine, and $500 in restitution.

I think before imposing sentence, I think it is worth
emphasizing what Judge Hogan and other judges of this court have
made clear, and that is that defendants in these Capitol cases
should not presume that probation is a default sentence, given

the seriousness of the offense, and that is especially true for those who committed assaults on officers and property damage.

But consistent with the sentences of other judges on this court in similar cases and as recommended by probation, as I've said, I think a sentence of probation is warranted in this case. But given the aggravated circumstances of Ms. Dillon's conduct, I do think a substantial length of probation is warranted, and therefore, I will impose a three-year sentence of probation, coupled with a two-month period of home detention. I do believe that's sufficient but not greater than necessary to achieve the purposes of punishment.

Ms. Dillon is certainly not among the least culpable in this large group of Capitol offenders, but she is certainly not the most either. I'm encouraged by Ms. Dillon's remarks here that at least now she does appreciate the serious severity of her offense. I credit her acceptance of responsibility and her clean criminal record to date. It does appear that this is an aberrant event in her otherwise law-abiding life.

Even so, I do find, consistent with Section 3553(a), that a three-year term of probation coupled with a 60-day period of home detention is sufficient to address the goals of sentencing, considering the nature of the offense and the other relevant factors. I believe that this is adequate to protect the community and to fulfill the goals of deterrence, both specific and general, as well as punishment. I don't believe that

1    imprisonment is necessary to provide specific deterrence or

2    respect for the law.

3        As I've mentioned, I'm not going to impose a community

4    service condition, given Ms. Dillon's other family obligations,

5    but I do expect her to seek and find employment, at least

6    part-time employment.

7        I do expect her to participate in mental health treatment

8    and undergo the mandatory drug tests.  At this time I don't see

9    the need for substance abuse treatment, but I will order, based

10   on what's stated in the presentence report and Ms. Dillon's

11   actions here, the mental health treatment.

12       So I'm now formally going to read the sentence.  Is there

13   any reason either side at this point has to object?

14             MR. ROMANO:  No, Your Honor.

15             MR. ABBENANTE:  No, Your Honor.

16             THE COURT:  All right.  Pursuant to the Sentencing

17   Reform Act of 1984 and in consideration of the provisions of

18   Title 18 United States Code Section 3553 as well, it is the

19   judgment of the Court that you, Brittiany Angelina Dillon, are

20   hereby sentenced to a term of three years' probation as to

21   Count 1.  In addition, you are to serve two months, or 60 days,

22   of home detention.  And I will go over the conditions of that in

23   a moment.

24       You are also ordered to pay a special assessment of $10 in

25   accordance with Title 18 United States Code Section 3013.

1    While on supervision, you shall abide by the following

2    mandatory conditions, as well as the standard conditions of

3    supervision, which are imposed to establish the basic

4    expectations for your conduct while on supervision.  The

5    mandatory conditions include not committing another federal,

6    state, or local crime, not unlawfully possessing a controlled

7    substance, refraining from any unlawful use of a controlled

8    substance, submitting to one drug test within 15 days of

9    placement on supervision, and at least two periodic drug tests

10   thereafter as determined by the Court.

11   You must make restitution in accordance with Title 18

12   United States Code Section 3663 and 3663(a).

13   And you shall comply with the following special conditions:

14   That is, participating in a mental health treatment program and

15   following the rules and regulations of that program.  The

16   probation officer, in consultation with the treatment provider,

17   will supervise your participation in the program.

18   With respect to home detention, you will be monitored by

19   the form of location monitoring technology for a period of 60

20   days, and you must follow the rules and regulations of the

21   location monitoring program.  The costs of the program will be

22   waived.  Location monitoring technology at the discretion of the

23   probation officer, including SmartLINK or any other technology

24   in the discretion of the probation officer.  This form of

25   technology will be used to monitor following restrictions on

1   your movement in the community.  You're restricted to your

2   residence at all times except for employment or seeking

3   employment opportunities, education, religious services, medical

4   or mental health treatment, attorney visits, court appearances,

5   court-ordered obligations, community service activities, or any

6   other activities as preapproved by the probation officer.

7        In addition, you must seek and maintain at least part-time

8   employment.  You will advise the probation officer of your

9   employment and notify the probation officer of any changes to

10  your employment status.

11       As I've said, I find you don't have the ability to pay a

12  fine.  Therefore, I waive imposition of a fine in this case.

13  You are ordered to make restitution to the Architect of the

14  Capitol in the amount of $500.  I've determined that you do not

15  have the ability to pay interest and, therefore, waive any

16  interest or penalties that may accrue on the balance.  The

17  restitution shall be made to the Clerk of Court for the U.S.

18  District Court to the Architect of the Capitol, and you must pay

19  the balance of any restitution owed at a rate of no less than

20  $50 each month.  The financial obligations are immediately

21  payable to the Clerk of Court.  You shall notify the Clerk of

22  Court of any change of address.

23       The Probation Office shall release the presentence

24  investigation report to all appropriate agencies in order to

25  execute the sentence of the Court.

1          All right.  Ms. Dillon, you do have the right to appeal

2     your conviction and sentence except to the extent you may have

3     validly waived that right as a part of your plea agreement.  If

4     you do choose to appeal, your notice of appeal must be filed

5     within 14 days after the Court enters judgment.  If you're

6     unable to pay the cost of an appeal, you may apply for leave to

7     file in forma pauperis, which simply means that the Court costs

8     such as filing fees will be waived.

9          The same holds true for your right to challenge the

10    conviction entered or the sentence imposed under 28 United

11    States Code Section 2255 if new and currently unavailable

12    information becomes available to you or on a claim that you

13    received ineffective assistance of counsel in entering a plea of

14    guilty to the offense of conviction or in connection with this

15    sentencing.

16         All right.  Are there any objections to the sentence?

17              MR. ROMANO:  No, Your Honor.

18              MR. ABBENANTE:  Your Honor, I don't have any

19    objections, but I would ask Your Honor to include her ability to

20    take her -- I know you mentioned medical appointments, but I

21    think that that applied to only Ms. Dillon.  I would ask that

22    you allow her to transfer or transport her husband's grandfather

23    and uncle to their medical appointments as she has been doing,

24    as well as picking up and taking her nephew, who is autistic.

25              THE COURT:  All right.  I don't disagree with you,

1    Mr. Abbenante.  I just think that these fall into the other

2    activities preapproved by the probation officer, and I certainly

3    think that medical appointments for herself or family members

4    would be included in that.

5              MR. ABBENANTE:  All right.

6              THE COURT:  Are you concerned that the probation

7    officer -- I can say medical appointments for Ms. Dillon or her

8    family.  Does that take care of your concern?  I'm reluctant to,

9    you know, delineate, because I'm sure there are many other

10   things that would fall into this category, carpool and other

11   things, and I just feel like probation should be able to work it

12   out with Ms. Dillon.  If they can't, I'm certainly here to hear

13   any objections that you have.

14             MR. ABBENANTE:  All right.  That's fine, Your Honor.

15             THE COURT:  All right.  Ms. Reichler, do you have any

16   concerns, corrections, additions to make to the sentence

17   imposed?

18             PROBATION OFFICER:  Not at this time, Your Honor.  I

19   just ask that Ms. Dillon hang on the line so that I can read her

20   the probation conditions.

21             THE COURT:  All right.  Mr. Romano, anything else?

22             MR. ROMANO:  Nothing for me, Your Honor.

23             THE COURT:  Okay.

24             MR. ABBENANTE:  Your Honor, I know that we filed a

25   superseding information, but does that require the government to

1    move to dismiss the other charges, I believe?

2            MR. ROMANO:  Yes, thank you.  The government does at

3    this time move to dismiss the charges in the original

4    information.

5            THE COURT:  All right.  The motion is granted.

6        Is there anything else?

7            MR. ABBENANTE:  No, Your Honor.  Thank you.

8            THE COURT:  All right.  Thank you.

9        Ms. Dillon, I wish you the best.

10           THE DEFENDANT:  Thank you.  Thank you so much.

11           THE COURT:  Thank you all.

12       (Proceedings adjourned at 10:17 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7          Please Note:  This hearing occurred during the

8    COVID-19 pandemic and is, therefore, subject to the

9    technological limitations of court reporting remotely.

10

11

12   /s/ Sara A. Wick                November 10, 2021

13   SIGNATURE OF COURT REPORTER        DATE

14

15

16

17

18

19

20

21

22

23

24

25
```